# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

CHRISTOPHER HAMLETT

No. 3:18-cr-24 (VAB)

## RULING ON POST-TRIAL MOTIONS

After a five-day trial, a jury found Christopher Hamlett guilty of two counts of sex trafficking of a minor under 18 U.S.C. § § 1591(a)(1), (b)(2), and (c), five counts of unlawful activity under the Travel Act under 18 U.S.C. § § 1952(a)(3)(A) and (b)(1)(i), and two counts of producing child pornography under 18 U.S.C. § 2251(a). Jury Verdict, ECF No. 305.

Following the verdict, Mr. Hamlett moved for a judgment of acquittal, arguing that the United States (the "Government") failed to prove each element of sex trafficking of a minor and production of child pornography. Motion for Acquittal, ECF No. 341.

In the alternative, Mr. Hamlett seeks to vacate the jury verdict and set a new trial, arguing that: (1) the Court should have suppressed evidence related to a cell phone officers warrantlessly seized, manipulated, and used to get magistrate approval of a warrant for its contents; (2) the Court should have allowed Mr. Hamlett to impeach Jane Doe with prior evidence of prostitution; (3) the Court should have allowed Mr. Hamlett to introduce mental health impressions of Department of Children and Families ("DCF") personnel to attack the credibility of Jane Doe and Mary Smith; and (4) the Court should have permitted Elaine Smith, Jane Doe's former foster mother, to testify about her reputation for honesty. Motion for New Trial, ECF No. 343.

For the following reasons, the Court **DENIES** both the motion judgment of acquittal and the motion for a new trial.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  Pre-Trial Case History

On February 8, 2018, officers arrested Christopher Hamlett for sex trafficking of a minor under 18 U.S.C. § 1591(a)(1). *See* Affidavit, Complaint, ECF No 1-1 at 9.

On February 14, 2018, a grand jury returned Christopher Hamlett's indictment, which charged him with one count of sex trafficking of a minor. *See* Indictment in 3:18-cr-24-AVC, ECF No. 11.

At the time of Mr. Hamlett's arrest, he alleges that "[p]olice did not, at the time, have a warrant to search Mr. Hamlett or the residence; however, police proceeded to conduct a search contemporaneous with the arrest." Memorandum in Support of Motion to Suppress Evidence, ECF No. 30 at 2–3. The search uncovered a cellular telephone in Hamlett's front right pocket, which officers seized as evidence because of the belief "that 'pimps' utilize numerous cellular telephones, many not in their name in order to avoid detection from law enforcement." *Id.* at 3.

After the United States Marshal's Office took custody of Mr. Hamlett, Special Agent Anabela Sharp noticed the front of the cellular phone displayed a photo of Jane Doe and her father. *Id.* at 2. Detective Lewis subsequently used his phone to call the last known phone number for Jane Doe. *Id.* at 3. There are different accounts whether the phone rang or vibrated when Detective Lewis called the seized phone, but it became "evident that [Hamlett] was in possession of Jane Doe's cellular phone" at the time of his arrest. *Id.* at 3.

On March 16, 2018, the Government applied for a search warrant to the contents of two cell phones in Mr. Hamlett's possession at the time of his arrest. Aff., ECF No. 20-1 at 2. Magistrate Judge Robert Richardson issued the warrant the same day. Warrant, ECF No. 21.

On March 27, 2018, Hamlett filed a motion to suppress evidence pertaining to "all evidence

obtained from the seizure and search of the cellphone ZTW Model Z835, IMEI 86423703548178, seized on February 9, 2019." Motion to Suppress, ECF No. 29.

On April 26, 2018, a grand jury returned Christopher Hamlett's superseding indictment, which charged him with two counts of sex trafficking of a minor and five counts of violating the Travel Act by facilitating prostitution. Superseding Indictment, ECF No. 56.

On June 28, 2018, a grand jury returned Christopher Hamlett's second superseding indictment, which charged him with two counts of sex trafficking of a minor, five counts of violating the Travel Act by facilitating prostitution, and two counts of production of child pornography. Second Superseding Indictment, ECF No. 133.

On August 10, 2018, Mr. Hamlett moved to transfer the case due to alleged partiality demonstrated during jury selection. Motion to Transfer, ECF No. 192.

On August 15, 2018, Mr. Hamlett's case was transferred to Judge Bolden. Order of Transfer, ECF No. 194.

On September 17, 2018, the Government moved *in limine* to preclude certain evidence. Specifically, the Government moved to precluded evidence of Jane Doe's mental health history, *see* Motion in Limine to Preclude Evidence of Jane Doe's Health History, ECF No. 231, and to preclude evidence of Jane Doe and Mary Smith's prior sexual history under Federal Rules of Evidence 412, *see* Motion in Limine to Preclude Evidence Under Federal Rule of Evidence 412 or Evidence of Consent, ECF No. 232.

On September 26, 2018, the Court held a pretrial conference where the parties argued their cases on the motions in limine. Minute Entry, ECF No. 258.

On September 27, 2018, the Court denied Mr. Hamlett's motion to suppress evidence related to the seized cell phone because Mr. Hamlett denied ownership of the phone and therefore

lacked standing to assert a Fourth Amendment interest in its contents. Ruling and Order on Motion to Suppress, ECF No. 250, at 8–9. Even if Mr. Hamlett could assert standing, the Court found that the officers seized the cell phone incident to a lawful arrest, which did not violate his Fourth Amendment rights. *Id.* at 9.

On October 1, 2018, the Court conducted jury selection and empaneled a jury. Minute Entry, ECF No. 262.

On October 5, 2018, the Court denied without prejudice to renewal at trial the motions in limine related to mental health history and prior sexual conduct under Rule 412. Ruling and Order on Motions in Limine, ECF No. 267.

### B.     Trial Proceedings

On October 9, 2018, the jury trial began. Minute Entry, ECF No. 281.

That same day, Detective Joshua Lewis testified that he first became involved with Hamlett's case in October 2017. October 9, 2018 Trial Transcript, ECF No. 326 at 41:1–3. Detective Lewis began investigating the case because he was tasked with finding Jane Doe, who was missing from DCF and suspected of being involved in sex trafficking. *Id.* at 42:1–43:3. Detective Lewis testified that he treated the case as a missing person investigation and worked to find her from Jane Doe's Facebook page, which DCF provided. *Id.* at 43:7–44:2. After unsuccessful efforts to locate Jane Doe, a volunteer outreach group that works on minor sex trafficking sent Detective Lewis screenshots from a cell phone text messaging conversation that included cell phone numbers that led to Mr. Hamlett's Facebook account. *Id.* at 47:25–50:18.

Detective Lewis also observed that Hamlett and Jane Doe were Facebook friends. *Id.* at 52:24–53:1. After locating Hamlett's Facebook account, Lewis input the phone number associated with that account into a forensic software that showed a website with commercial sexual act

advertisements. *Id.* at 53:10–23. Once directed to this page, Detective Lewis recognized a photo of Jane Doe from her Facebook page. *Id.* at 54:1–6.

After investigating Christopher Hamlett, Detective Lewis testified that he executed an arrest warrant for Mr. Hamlett on February 8, 2018. *Id.* at 204:1–15. After the arrest, Detective Lewis patted Mr. Hamlett and discovered a cell phone. *Id.* at 205:3–7. Detective Lewis testified that Mr. Hamlett stated that the phone belonged to his aunt. *Id.* at 205:1–16.

While other officers processed Mr. Hamlett, Detective Lewis noticed that the home screen of the phone recovered during Hamlett's arrest showed Jane Doe and her father. *Id.* at 206:24–207:1. After calling the last phone number he had for Jane Doe, Detective Lewis noted that the phone "vibrated and rang, rang in the vibrate mode." *Id.* at 207:2–7.

On October 10, 2018, Jane Doe testified that she started working for Mr. Hamlett in August 2017 and worked for him until after she turned eighteen. October 10, 2018 Trial Transcript, ECF No. 320, at 389:14–390:4. During this work, Mr. Hamlett took care of client communication and would provide Jane Doe with instruction as to the prices of sex services, appointment times, and duration of appointments with each client. *Id.* at 378:8–387:14. Jane Doe later testified that her work required her to put her "mouth" on a "[m]ale's genital." *Id.* at 446:11–24.

Jane Doe also testified that Mr. Hamlett took pictures of her, where Mr. Hamlett told her to pose. *Id.* at 371:11–372:10. After Mr. Hamlett took the photographs, he told Jane Doe that "he was going to put it on the website." *Id.* at 376:12–15. Jane Doe similarly testified that she saw her pictures and name on a website advertisement that she did not place. *Id.* at 393:19–394:1.

Jane Doe testified that she communicated by text with Hamlett when she worked for him and that she had his number saved in her phone. *Id.* at 403:16–21. Evidence of text messages between Hamlett and Jane Doe were presented in which Hamlett stated, "[y]ou have to pay me or

trust it will go bad for you. I put on to this game . . . ." *Id.* at 423:3–5.

Separately, Jane Doe testified that she and Mr. Hamlett had sex. *Id.* at 56:17–57:8.

During Jane Doe's cross examination, the Court precluded defense counsel from inquiring into whether Jane Doe had taken medication for any mental illness, reasoning that defense counsel had "not connected it to issues of credibility" and that the Court found it "unduly prejudicial." *Id.* at 554:3–6.

On October 11, 2018, Mary Smith testified that she worked for Mr. Hamlett by having sex for money. October 11, 2018 Trial Transcript, ECF No. 328, at 708:15–709:9. Ms. Smith further testified that Hamlett would communicate with clients via text message on her behalf—and that she never communicated with the clients directly. *Id.* at 710:3–14.

Mary Smith also testified that Mr. Hamlett took photos of her during the time she worked for him and that she was naked in some photographs. *Id.* at 715:5–16. Smith testified that she did not know how to post and advertise herself for sex and that she had never done that. *Id.* at 767:16–768:21.

On October 11, 2018, Special Agent Sharp testified that multiple numbers and addresses discovered during the investigation depict subscriber information related to Mr. Hamlett, either as a variation of his name or family members. October 11, 2018 Trial Transcripts, ECF No. 328, at 811:7–831:22. Sharp also testified that multiple advertisements placed on the website used to advertise commercial sex acts related back to the numbers identifying Hamlett as the subscriber. *Id.* at 832:9–839:3. Sharp further testified that the same device created the user IDs for Green Dot and the website advertisements. *Id.* at 846:18–847:13.

On October 12, 2018, at the close of the Government's case, Mr. Hamlett moved for acquittal, which the Court denied. Oral Motion for Acquittal, ECF No. 289; Order Denying Motion

for Acquittal, ECF No. 300.

On the same day, Mr. Hamlett moved to continue the trial, which the Court denied. Oral Motion to Continue Trial, ECF No. 290; Minute Entry, ECF No. 292.

On October 16, 2018, the jury trial concluded. Minute Entry, ECF No. 297. The same day, the jury returned a guilty verdict as to counts 1–9 and the Court accepted the verdict. *Id.*

### C.    Post-Trial Motions

On February 13, 2019, Mr. Hamlett moved for acquittal on the two sex trafficking of a minor counts and the two child pornography counts. Motion for Acquittal, ECF No. 341.

The same day, Mr. Hamlett also moved to vacate the jury verdict and hold a new trial. Motion for New Trial, ECF No. 343.

On April 12, 2019, the Government filed memorandums in opposition to Mr. Hamlett's motions for acquittal and for a new trial. Memorandum in Opposition re Motion for Acquittal, ECF No. 349; Memorandum in Opposition re Motion for New Trial, ECF No. 350.

On July 22, 2019, the Court held oral argument on the motions for acquittal and for a new trial. Minute Entry, ECF No. 365.

## II.    STANDARD OF REVIEW

### A.    Judgment of Acquittal

When reviewing a judgment of acquittal after a jury verdict, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt

beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)) (alteration and internal quotation marks omitted). A defendant challenging the sufficiency of the evidence thus "bears a heavy burden." *United States v. Si Lu Tian,* 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks omitted).

### B.     Motion to Vacate and Grant a New Trial

Rule 33 allows the court to "grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. Under Rule 33, the trial court has "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In deciding such a motion, the court may weigh the evidence and the credibility of witnesses but cannot "wholly usurp" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000). Accordingly, the power to set aside a jury verdict "should be used 'sparingly' and only 'in the most extraordinary circumstances.'" *United States v. Zayac*, No. 3:09–cr–00136 (JCH), 2011 WL 5238823, at *2 (D. Conn. Nov. 1, 2011) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

The court also "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice." *Id.* To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

Mr. Hamlett challenges the sufficiency of the evidence on the counts of sex trafficking of a minor and production of child pornography, claiming that the Government failed to prove the

elements of each charge. Memorandum of Law in Support of Judgment of Acquittal, ECF No. 342 ("Mem. in Supp. of J. of Acquittal"), at 3–4. In the alternative, Mr. Hamlett seeks to vacate the jury verdict and have a new trial. Memorandum of Law in Support of New Trial, ECF No. 344 ("Mem. of Law in Supp. of Mot. for New Trial").

Accordingly, the Court will address the judgment of acquittal first. If necessary, the Court then will address the motion to vacate and to hold a new trial.

## A. Judgment of Acquittal

When challenging a jury's verdict, "a defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citing *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). While "specious inferences are not indulged," *see United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008), courts "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence," *see United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Autuori*, 212 F.3d at 114 (quoting *Guadagna*, 183 F.3d at 129) (alterations omitted).

In support of his motion for judgment of acquittal, Mr. Hamlett argues that the Government failed to prove all elements of sex trafficking of a minor and production of child pornography. Mem. in Supp. of J. of Acquittal at 3. Mr. Hamlett argues that Jane Doe lied to Mr. Hamlett about her age and that he never caused Jane Doe nor Mary Smith to engage in commercial sex acts because of his actions. *Id.* Mr. Hamlett argues that Jane Doe only testified that she engaged in "sex acts" and a "blow job," but she never stated what she did on any single

date with a client. *Id.* at 4. And Mary Smith vaguely testified to "having sex to make money," without describing the sex acts in question. *Id.*

Mr. Hamlett then asserts that the Government failed to provide proof of producing child pornography because the Government failed to prove that Mr. Hamlett was the person who posted the photographs to the internet. *Id.* Rather, Mr. Hamlett reiterates his trial argument that the pictures were taken with his cousin's cell phone and that Mr. Hamlett's online accounts were used by others. *Id.*

In response, the Government argues that the sex trafficking of a minor statute does not require the commission of a sex act. Government's Opposition to Defendant's Motion for Judgment of Acquittal, ECF No. 349, at 5–7. Even then, the Government argues that it proved that Jane Doe and Mary Smith both engaged in sex acts with clients at the direction of Mr. Hamlett. *Id.* at 7–9. In addition, the Government argues that, even though Jane Doe and Mary Smith lied to Mr. Hamlett about their ages, Section 1591(a) is a strict liability statute regarding the victim's age thus the Government need not prove knowledge or reckless disregard for the minor victim's ages, so long as Mr. Hamlett had a reasonable opportunity to observe the victims—which he did here. *Id.* at 9–10.

The Government also argues that that it need not prove that Mr. Hamlett posted the pornographic images. Rather, the Government asserts that it need only prove the elements of the charge. *Id.* at 11. The Government then asserts that it proved that Mr. Hamlett used, persuaded, induced, enticed, or coerced Jane Doe in Mary Smith to engage in sexually explicit conduct to taking photographs through trial evidence. *Id.* at 11–12. And that Mr. Hamlett had reason to know that the pornographic images would reach the internet because Mr. Hamlett's e-mail address published the advertisements that accompanied the images. *Id.* at 12. Even if the

Government had not proved that Mr. Hamlett himself posted the photographs to the internet, Jane Doe and Mary Smith testified separately about his involvement with taking their photographs and his e-mail account published the pornographic images. *Id.* at 12–13.

The Court agrees

When reviewing a Rule 29(c) motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). In sum, "[t]he government's case need not exclude every possible hypothesis of innocence," *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir. 1995) (internal quotation marks omitted), and where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter" *see Guadagna,* 183 F.3d at 129 (internal quotation marks omitted) (alteration in original).

In addressing a Rule 29 motion, a court must consider evidence "in its totality, not in isolation, and the Government need not negate every theory of innocence." *Autuori,* 212 F.3d at 114. The Court must view the evidence in the light most favorable to the Government and draw all reasonable inferences in the Government's favor. *Id.* Circumstantial evidence—alone—may be sufficient to sustain a conviction. *United States v. Wexler,* 522 F.3d 194, 206–207 (2d Cir. 2008).

Here, viewing the evidence in the light most favorable to the Government, the Government has met its burden on both sex trafficking of a minor counts and both child

pornography counts because a reasonable jury could have found the essential elements of those crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319 (finding that the judgment of acquittal threshold is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)).

### 1. Sex Trafficking of a Minor

Mr. Hamlett challenges the sex trafficking counts on two grounds: (1) that the Government failed to present sufficient evidence that Mr. Hamlett knew that either Jane Doe or Mary Smith were under the age of eighteen; and (2) that he knew that either Jane Doe or Mary Smith would engage in commercial sex acts.

First, Section 1591 is a strict liability statute, so the Government need only prove that Mr. Hamlett had a reasonable opportunity to observe Jane Doe and Mary Smith. "In a prosecution under § 1591, the government may satisfy its burden of proof with respect to the defendant's awareness of the victim's age by proving any of the following beyond a reasonable doubt: (1) the defendant knew that the victim was under eighteen, (2) the defendant recklessly disregarded the fact that the victim was under eighteen, *or*, (3) the defendant had a reasonable opportunity to observe the victim." *United States v. Robinson*, 702 F.3d 22, 34 (2d Cir. 2012) (emphasis in original). The Second Circuit further held that "[t]he government need not prove any *mens rea* with regard to the defendant's awareness of the victim's age if the defendant had a reasonable opportunity to observe the victim." *Id.* Accordingly, the statute "imposes strict liability with regard to the defendant's awareness of the victim's age, thus relieving the government of its usual burden to prove knowledge or reckless disregard of the victim's underage status under § 1591(a)." *Id.*

Here, while both parties concede that both Jane Doe and Mary Smith lied about their ages, the Government has proven that Mr. Hamlett had a reasonable opportunity to observe them thus the Government met the burden of strict liability provision of the statute. Even though both Jane Doe and Mary Smith lied, when viewing the evidence in the light most favorable to the Government, the Government has met its burden that Mr. Hamlett had a reasonable opportunity to observe Jane Doe and Mary Smith had and was therefore strictly liable for any violation of 18 U.S.C. § 1591.

For example, Jane Doe testified that she spent hours with Mr. Hamlett during their initial meeting, *see* October 10, 2018 Trial Transcript, ECF No. 320, at 357:6–363:22 (detailing Jane Doe's first meeting with Mr. Hamlett), and she met with him again weeks later before Mr. Hamlett agreed to put Jane Doe on a website and take her pictures, *see* 369:14–371:4. In addition, Jane Doe testified that she had sex with Mr. Hamlett on more than one occasion. October 10, 2018 Trial Transcript, ECF No. 320, at 389:4–8. ("Q. What happened in the hotel when [Mr. Hamlett] stayed there with you? A. We had sex. Q. Why did you have sex with the defendant? A. Because he asked me to."); *id.* at 401:20–402:4 ("Q. Now, you previously testified that you had sex with Cadi near or around the first time you started working for him, correct? A. Yes. Q. Did you have sex with him on other occasions after that? A. Yes. Q. Can you estimate about how many times you had sex with him? A. More than 20.").

Mary Smith also testified as to having told Mr. Hamlett at one time that she was 17. Although she actually was 16 at the time, he certainly had a basis to know she might be underage. October 11, 2018 Trial Transcript, ECF No. 328, at 714:16–24 (Q: What was that second discussion? A: I told him my real age, that I was – I mean I told him another lie. Q: What was the – A: I told him I was 17. Q: And how did he react when you told him you were 17? A:

He just – he just said that thanks for telling the truth, like.").

Because of this testimony and 18 U.S.C. § 1591(c), which "creates strict liability where the defendant had a reasonable opportunity to observe the victim," *see Robinson*, 702 F.3d at 32, the Government has met its burden in showing that Mr. Hamlett had a reasonable opportunity to observe the ages of both Jane Doe and Mary Smith.

Second, under 18 U.S.C. § 1591(a), sex trafficking of children by force, fraud, or coercion requires that an individual that knowingly "in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." The statute defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

While Mr. Hamlett argues that neither Jane Doe nor Mary Smith testified about the specific occurrence of sex acts, the statute does not require that level of specificity. Indeed, recently where the defendant "argue[d] that there was no evidence of a commercial sex act having actually been performed by the victims," this argument did "not comport with the plain meaning of the statute." *United States v. Corley*, 679 F. App'x 1, 7 (2d Cir. 2017) (summary order). Rather, the statute "requires only that the defendant 'know' that the victim 'will be caused' to engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred." *Id.* So too here.

In any event, Jane Doe did testify about the occurrence of specific sex acts. *See, e.g.*, October 10 Trial Transcript, ECF No 320, 377:22–378:7 ("Q. What did you understand "a date" to mean? A. With a client. Q. Is that the term that was used generally throughout the time you

were with the defendant? A. Yes. Q. What did you understand was supposed to happen when you met with a client on a date? A. Sexual acts. Q. And did he, in fact, set you up on a date that day? A. Yes."); *id.* at 381:15–24 ("Q. And when you went outside, what happened? A. I got in the car. Q. And where did you go? A. He took me to a guy's house. Q. When you got into the car, was anyone else with you? A. No, just me and him. Q. And what happened when you got to this other house? A. Sexual acts."); *id.* at 386:11–16 ("Q. Did you participate in a two-girl special with Tasha? A. Yes. Q. Can you explain what happened during that two-girl special? A. Sex."); *id.* at 399:6–21 ("Q. And for each of those clients under ten on an average day, what type of services were you performing, generally? Let me clarify. What were you being hired to do? A. Sexual acts. Q. For ten clients, approximately, a day? A. Yes. Q. Now, you previously testified about two-girl specials, correct? A. Yes. Q. During the time you worked for the defendant, did you do a two-girl special with anyone other than Tasha? A. Yes. Q. Who was that? A. Amanni.").

Ms. Doe also testified to how much she charged for sex acts, at Mr. Hamlett's direction. *See id.* at 379:16–380:16 ("Q. What did the defendant say you were supposed to charge relating to a quick visit? A. 100. Q. Were there other prices as well? A. Yes. Q. Did those prices also come from the defendant? A. Yes. Q. What was the next price that he told you? A. 150 . . . Q. Did you discuss any other pricing that day? A. Yes. Q. What else? A. 200 for an hour. Q. Who told you it was 200 for an hour? A. Cadi."); *id.* at 412:6–18 ("Q. What was your understanding of 'the whole play,' what that meant? A. The client was supposed to pay 160. Q. And 'the whole play' was a reference to what? A. The whole play. I don't know, the client -- me being with the client. I don't know. Q. And what was happening with the client? What were you meeting him for? A. 160. Q. And what was suppose to happen in exchange for 160? A. Sex.").

Ms. Smith then testified to similar sex acts. *See, e.g.*, October 11, 2018 Trial Transcript, ECF No. 328, at 708:6–8 ("What did you understand you were going to be doing to make money? A. Having sex."); *id.* at 709:3–9 ("Q: Sure, What was your understanding of Cadi's role in helping you make money? A: I'm not – I guess finding clients. Q: And that's finding clients for what? A: To make money. Q: To make money by having sex? A. Yeah"); *id.* at 710:20–7:11:10 ("Q: Did you see any prostitution customers during the time you worked with Cadi A: Prostitution customers? Q: Did you see any clients? A: Me? Q: Yes. A: Yes. Q: Did you have sex with those clients? A: Yes. Q: Do you have any idea how many you saw? A: No. Q: Where did these appointments occur? A: Different locations. Q: What are the different locations by category? A: In the car or in the hotel."); *id.* at 712:12–14("Q. And when you saw clients for sex, did you receive anything in exchange? A. Money."); *id.* at 723:10–12 ("Q. And by "make money," how are you going to be making money again? A. By having sex."); *id.* at 736:6–17 ("Q. While you were working for Cadi, did you ever work with any other females? A. Yeah. Q. More than one or just one? A. Just one . . . Q. What did the two of you do together? A. Have sex. Q. With a customer? A. Yes, a client.").

Ms. Smith also testified to how much she charged for sex acts, at Mr. Hamlett's direction. *See id.* at 713:6–714:4 ("Q: Do you recall what the prices were? A: Yes. Q: What were they? A: 100, 150, and 200. Q: What was $100 for? A: A quick visit. Q: And what is a quick visit? A: 15 minutes. Q: What was $150 for? A: 30 minutes. Q: And what was $200 for? A: An hour. Q: Who set those prices? Who set those prices? A: Who told me? Q: Yes. A: Cadi. Q: After you would see a client and get money from the client, what would you do with it? A: What would I do with it? Q: Did you give any money to anyone? A: Oh, yes, 40 percent to Cadi. Q. And did you keep the rest of it? A. Yes.").

When viewing the evidence in the light most favorable to the Government, the jury had a sufficient evidence to conclude that Mr. Hamlett had knowledge that Jane Doe and Mary Smith had cause to engage in a commercial sex act in violation of 18 U.S.C. § 1591.

### 2. Child Pornography

Under 18 U.S.C. § 2251(a), the child pornography statute criminalizes anyone who intentionally "employs, uses, persuades, induces, entices, or coerces any minor to engage in, . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . ." "[S]exually explicit conduct" is defined to include the "lascivious exhibition of the genitals or pubic area of any person." *Id.* at § 2256(2)(A)(v).

"Section 2251(a) applies only to the actual production of child pornography; other statutes—not charged in this case—proscribe distribution." *United States v. Broxmeyer*, 616 F.3d 120, 124 (2d Cir. 2010); *cf. United States v. Dauray*, 215 F.3d 257, 263 (2d Cir. 2000) (explaining that 18 U.S.C. § 2252(a)(3) prohibits the sale or possession with intent to sell child pornography and § 2252(a)(2) prohibits the receipt or distribution of child pornography).

To secure a child pornography conviction under 18 U.S.C. § 2251(a), the Government must prove three elements beyond a reasonable doubt: "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." *Broxmeyer*, 616 F.3d at 124 (quoting *United States v. Malloy*, 568 F.3d 166, 168 (4th Cir. 2009)).

Here, Mr. Hamlett seeks to extend the evaluation of Section 2251(a) to include distribution by posting the pornographic images to backpage.com. This is not a requirement of

the statute, however, and has no impact on the offensive conduct the Court charged the jury to evaluate. *See United States v. Davis*, 624 F.3d 508, 514 (2d Cir. 2010) (finding that "the jurisdictional element of section 2251(a) does not require that the knowledge of interstate transmission be contemporaneous with the substantive offense conduct"); *see also Broxmeyer*, 699 F.3d at 284 (recognizing "distribution of child pornography subjects the depicted child to more harm than that caused by production alone").

Because distribution is not an essential element of Section 2251(a), the Government need not prove that Mr. Hamlett actually posted the pornographic images of Jane Doe and Mary Smith to backpage.com; rather, the Government only needed to prove that Mr. Hamlett produced the images. And through the testimony of Jane Doe and Mary Smith, it did. October 10, 2018 Trial Transcript, ECF No. 328, 371:11–372:10 (Jane Doe testifying that Mr. Hamlett took pictures of her, where Mr. Hamlett told her to pose); October 11, 2018 Trial Transcript, ECF No. 328, at 715:18–13 (Mary Smith testifying that Mr. Hamlett took photos of her during the time she worked for him and that she was not clothed in all the photographs).

Accordingly, when viewing the evidence in the light most favorable to the Government, the Government has met its burden regarding the two child pornography counts. *See United States v. Holston*, 343 F.3d 83, 91 (2d Cir. 2003) ("The government need not demonstrate a nexus to interstate commerce in every prosecution. As we are satisfied that § 2251(a) lies within Congress's powers under the Commerce Clause, the fact that [Defendant] neither shipped the materials interstate nor intended to benefit commercially from his conduct is of no moment." (citation omitted)).

### B.    Motion to Vacate and Grant a New Trial

"Generally, the trial court has broader discretion to grant a new trial under Rule 33 than

to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson,* 246 F.3d at 134. When reviewing a motion to vacate and hold a new trial, "the court may grant the motion if the interest of justice so requires." Fed. R. Crim. P. 33(a). In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson,* 246 F.3d at 134. When considering a Rule 33 motion, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," only intruding in "exceptional circumstances," such as cases where "testimony is 'patently incredible or defies physical realities.'" *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted). And "the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citing *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).

Here, Mr. Hamlett argues four grounds for a new trial: (1) that the Court should have suppressed evidence related to a cell phone seized at the time of his arrest; (2) that the Court should have allowed Mr. Hamlett to impeach Jane Doe with alleged evidence of prior prostitution; (3) that the Court should have permitted Mr. Hamlett to cross-examine Jane Doe and Marry Smith regarding their mental health diagnoses and should have allowed Mr. Hamlett to introduce expert testimony on the matter; and (4) that the Court should not have precluded Mr. Hamlett's ability to call Jane Doe's former foster mother for character testimony.

Accordingly, the Court will address each of these challenges in turn.

### 1. Motion to Suppress

To contest a Fourth Amendment violation, a party "must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 138 S.Ct. 1518, 1530 (2018). A party, however, cannot vicariously assert Fourth Amendment rights on behalf of another. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). A "defendant seeking suppression of evidence found without a search warrant must show that he had a reasonable expectation of privacy in the place or object searched." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017). "One need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects, so long as he has the right to exclude others from dealing with the property." *United States v. Santillan*, 902 F.3d 49, 62 (2d Cir. 2018) (citing *United States v. Perea*, 986 F.2d 633, 639–40 (2d Cir. 1993)).

On the other hand, "[i]f a defendant has shown that he had a reasonable expectation of privacy in the place or object in question, the government has the burden of showing that the entry, search, or seizure was lawful because it fell within one of the exceptions to the warrant requirement." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). One exception is a search incident to arrest, which allows officers to seize evidence an arrestee "might conceal or destroy," so long as the search is "substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) (citing *Arizona v. Gant*, 556 U.S. 332, 339 (2009)).

In support of his motion for a new trial, Mr. Hamlett argues that the Court erroneously denied his motion to suppress the cellular phone seized from his person because Mr. Hamlett did not relinquish his right to privacy in the seized phones, nor did he consent to the search that uncovered the phone. Mem. of Law in Supp. of Mot. for New Trial at 5–8. Mr. Hamlett argues

that the Government failed to carry its burden that probable cause supported the warrantless

seizure of Mr. Hamlett's cell phone. *Id.* at 9–11. And Mr. Hamlett contends that there was

nothing in the present case to lower the constitutional standard for a seizure to reasonable

suspicion. *Id.* at 11–12.

Even if there was probable cause, Mr. Hamlett argues that securing a search warrant more

than a month after seizing the phone was untimely. *Id.* at 13. Finally, Mr. Hamlett argues that

Agent Sharp searched the phone by turning the phone on and having someone call the number

that officers believed corresponded to the seized phone, which violated Mr. Hamlett's reasonable

expectation of privacy. *Id.* at 14–21. Without an independent source of the evidence, Mr.

Hamlett argues that the Court should have suppressed the evidence related to the cell phone. *Id.*

22–23.

In response, the Government argues that Mr. Hamlett has offered no authority to suggest

that any erroneous evidentiary ruling in the motion to suppress would support his request for a

new trial; instead, he is simply relitigating past evidentiary that he disagreed with. Memorandum

of Law in Opposition to Motion for a New Trial, ECF No. 350 ("Mem. of Law in Opp'n to Mot.

for New Trial"), at 9. Specifically, Mr. Hamlett never establishes how suppression of the

Government's evidence would have established his innocence. *Id.* at 10. Even if the Court

suppressed the evidence related to the cell phone, the Government argues that remaining

evidence was sufficient to establish Mr. Hamlett's guilt. *Id.* at 10–11. Because Mr. Hamlett

merely relitigates evidentiary rulings, the Government argues that he has not established the

"extreme circumstances" necessary for a new trial.

Moreover, the Government argues that Mr. Hamlett lacked standing to assert a privacy

interest in the cell phone, and officers recovered the cell phone incident to a lawful arrest. The

Government asserts that the Court properly denied Mr. Hamlett's motion to suppress for lack of standing because he did not establish a property right or a reasonable expectation of privacy in the contents of the cell phone. *Id.* at 12–13. Detective Lewis testified that Mr. Hamlett denied ownership of the cell phone that he seized from his person at the time of the arrest. *Id.* at 13. Jane Doe then testified that Hamlett using her cell phone at the time of his arrest. *Id.* Because Mr. Hamlett proclaimed that he did not own the cell phone, the Government argues that he did not have standing to challenge that the cell phone evidence was improper. *Id.* at 14–15.

The Government also argues that the seizure of the cell phone was proper, the delay in searching the phone was reasonable, and the officers acted in good faith. The Government contends that because officers lawfully arrested Mr. Hamlett, and agents recognized it as potential evidence because of advertisements of Jane Doe for sex acts listed with Mr. Hamlett's cell phone, photographs of Jane Doe, and communications with agents during the investigation. *Id.* at 16–17. The Government then argues that the delay in securing a warrant for the cell phone is not an issue because Mr. Hamlett did not have a reasonable expectation of privacy and officers secured the warrant after Mr. Hamlett's arraignment and detainment hearings. *Id.* at 18–19.

Even then, the magistrate judge, who was aware of the gap between seizure of the phone and the warrant, still granted the warrant. *Id* at 20. The Government next argues that turning the phone on and viewing the lock screen was not a search because it did not reveal any personal information. *Id.* at 21–22. Finally, because the suppression of the evidence would not deter further police misconduct because a warrant was facially valid and issued by a neutral magistrate judge, the Government argues that the officers executed the search in good faith. *Id.* at 22–24.

The Court agrees.

Here, Mr. Hamlett had no reasonable expectation of privacy in the cell phone because he

had no right to exclude others from it. To establish a reasonable expectation of privacy, Mr. Hamlett cannot simply rest on the Fourth Amendment privacy rights of another. *See Plumhoff*, 572 U.S. at 778 ("Our cases make it clear that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'"). But that is exactly what he seeks to do because he has never stated that he owned the cell phone; instead, he asserts that it belonged to his aunt. *See* Motion to Suppress, ECF No. 30, at 9; *see also* October 9, 2018 Trial Transcript, ECF No. 326, at 205:00–16 (testimony from the arresting officer that, at the time of his arrest, Mr. Hamlett stated that the phone belonged to his aunt).[1] Because Mr. Hamlett denounced ownership of the phone at the time of his arrest, he cannot "show that he had a reasonable expectation of privacy in the place or object searched." *See Delva*, 858 F.3d at 148.

Even if Mr. Hamlett could establish a reasonable expectation of privacy in the cell phone, Detective Lewis seized the phone as part of a search incident to a lawful arrest. Under the search-incident-to-arrest doctrine, any contemporaneous search of Mr. Hamlett during that arrest would fall under the search-incident-to-arrest exception of the Fourth Amendment warrant requirement. *See Diaz*, 854 F.3d at 205 ("It makes no difference whether the search occurs before or after the arrest [], so long as it is 'substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.'" (citations omitted)).

Here, the Detective Lewis seized from Mr. Hamlett's "right front pants pocket" after officers executed an arrest warrant for Mr. Hamlett. Hartford Police Report, Motion to Suppress Ex. 1, ECF No. 30-1. The underlying search therefore was "substantially contemporaneous with

---

[1] All evidence indicates that the cell phone belonged to Jane Doe. *See* Search Warrant Affidavit, Ex. 3, ECF No. 20-1. ("While HAMLETT was being processed, [Agent Sharp] checked TARGET PHONE 2 to determine if there was a passcode locking device. [Agent Sharp] immediately recognized the locked screen photograph as an image of the [Jane Doe] and her father . . . To determine if TARGET PHONE 2 was the [Jane Doe]'s phone, [Agent Sharp] asked Detective Lewis to call the [Jane Doe]'s phone number. When Det. Lewis dialed the number for MV, TARGET PHONE 2 rang").

the arrest and is confined to the immediate vicinity of the arrest." *Diaz*, 854 F.3d at 205(citations

omitted). In the absence of a challenge to the arrest as unsupported by probable cause, the seizure

of the cell phone after a lawful search incident to arrest was permissible.

Accordingly, Mr. Hamlett has not established the "extraordinary circumstances"

necessary for a new trial, *see United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008), the Court

will therefore "defer to the jury's resolution of conflicting evidence and assessment of witness

credibility," *see Ferguson*, 246 F.3d at 134.[2]

### 2.    Impeachment of Jane Doe

Federal Rule of Evidence 412(a)(1) provides that in a case involving allegations of sexual

misconduct, "evidence offered to prove that a victim engaged in other sexual behavior" is

inadmissible. The Rule "aims to safeguard the alleged victim against the invasion of privacy,

---

[2] Furthermore, as the Government rightly points out, even if the Court granted Mr. Hamlett's suppression motion, there is more than ample evidence to support the jury's conviction of Mr. Hamlett:

> (1) identification of Hamlett by Jane Doe, Mary Smith, Chelsea Lorette and Tashayonna Stevenson as the person who promoted them in prostitution; (2) the testimony of Tashayonna Stevenson who observed Jane Doe being trafficked by Hamlett; (3) the testimony of Chelsea Lorette about the images she sent the defendant appearing in advertisements along with Jane Doe and Mary Smith; (4) the testimony of both Jane Doe and Mary Smith about performing a commercial sex act together while they were working for Cadi; (5) Backpage advertisements with images for Jane Doe, Mary Smith, Tashayonna Stevenson and Chelsea Lorette, linked to the email account of chrishamlet53@yahoo.com and/or telephone numbers linked to Hamlett; (6) testimony and text messages from Jane Doe establishing that during the charged time period, she regularly communicated with the defendant and that she used phone number 860-818-2269 to do so, and that those messages included communications about prices and scheduling clients for sex acts; (7) telephone records establishing that this same number was registered in the defendant's name; (8) evidence that the phone number 860-818-2269 was also used to post more than 400 advertisements on Backpage for commercial sex, including those introduced at trial promoting Jane Doe, Mary Smith, Tashayonna Stevenson and Chelsea Lorette – and that those same females each testified that it was the defendant who was their pimp and promoted them in prostitution; (9) Facebook records showing that the 860-818-2269 was the assigned phone number for the Facebook account "Cadillac Black," with Hamlett's profile picture indicating that Hamlett studied at "Pimp Academy," and numerous Facebook messages demonstrating the defendant was engaged in sex trafficking; (10) testimony from Jane Doe and Mary Smith about the defendant's use of hotels for "out calls" and the documentary evidence from a Super 8 hotel demonstrating that Christopher Hamlett rented a room utilizing the 860-818-2269 during the charged time period; and (11) records from telephone companies, including Text Now and AT&T, linking other Backpage advertisements to the defendant.

Mem. in Opp'n to Mot. for a New Trial at 10–11.

potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details." Fed. R. Evid. 412 advisory committee's note. "The exclusion, however, is not absolute." *United States v. Rivera*, 799 F.3d 180, 184 (2d Cir. 2015). The Rule prohibits exclusion of "evidence whose exclusion would violate the defendant's constitutional rights." *See* Fed. R. Evid. 412(b)(1)(C). The constitutional rights contemplated by this exception include "a meaningful opportunity to present a complete defense" at trial, *see Holmes v. South Carolina,* 547 U.S. 319, 324 (2006), and to confront the witnesses by "impeach[ing] the credibility of a prosecution witness by cross-examination directed at possible bias," *see Davis v. Alaska,* 415 U.S. 308, 309 (1974).

Mr. Hamlett argues that that he was unable to present his theory that someone else sex trafficked Jane Doe because he was unable to impeach her with propensity evidence of past advertisement of prostitution activities. Mem. of Law in Supp. of Mot. for New Trial at 24–33. Mr. Hamlett asserts that the Court erroneously precluded cross-examination on prior sexual advertisements, allegations of sexual abuse, posting provocative photos, and alleged false pregnancy claims in violation of Mr. Hamlett's Sixth Amendment right to confront witnesses against him. *Id.* at 33. Mr. Hamlett argues that other sexually explicit conduct by the witnesses were probative of Mr. Hamlett's identity defense. *Id.* at 35.

Mr. Hamlett also argues that the Court limited his ability to present evidence of past sexual behavior for identity and motive, violating his Fifth and Sixth Amendment rights to advance a theory of his defense of no involvement in child pornography. *Id.* at 36. Moreover, Mr. Hamlett suggests that past sexual behavior was probative of attention-seeking behavior, and the Court preventing the introduction of this evidence violated his Fifth and Sixth Amendment rights. *Id.* at 36–37.

In response, the Government argues that DCF officials never proved the alleged false allegations of sexual conduct in the DCF records and allowing Mr. Hamlett to present the evidence to the jury would have led to mini-trials on the veracity of the DCF narratives. Mem. of Law in Opp'n to Mot. for New Trial at 27. Additionally, the Government contends that evidence of prior sex trafficking would have no bearing on the credibility of the sex trafficking allegations in this case. *Id.* at 28. Finally, the Government argues that the Court permitted Mr. Hamlett to pursue his theories by attacking witness credibility, that someone other than Mr. Hamlett introduced Jane Doe and Mary Smith to prostitution, or that either Jane Doe or Mary Smith promoted their prostitution without Mr. Hamlett. *Id.* at 28.

The Court agrees.

Rule 412(a) prohibits evidence offered to prove a victim engaged in sexual behavior or to prove a victim's sexual predisposition. *See Rivera*, 799 F.3d at 184; *see e.g., United States v. Graham*, 707 F. App'x. 23, 28–29 (2d Cir. 2017) (affirming the district court's grant of a motion to preclude evidence that victims worked as prostitutes because "'evidence offered to prove that a victim engaged in other sexual behavior' is generally inadmissible in a proceeding involving sexual misconduct"). The Rule, however, does allow three limited exceptions to the general prohibition: admission (1) to prove that another person was the source of the injury, (2) to show consent, and (3) to avoid a violation of the defendant's constitutional rights. Fed. R. Evid. 412(b)(1). Here, Mr. Hamlett rests his challenge on the third exception.

Due to the Confrontation Clause, a "district court should afford wide latitude to a defendant in a criminal case to cross-examine government witnesses" because "a defendant the right not only to cross-examination, but to effective cross-examination." *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2013) (citing *Figueroa*, 548 F.3d at 227) (internal quotation marks

omitted). At the same time, "[a] district court is accorded broad discretion in controlling the scope and extent of cross-examination." *Id.* (citing *United States v. Caracappa*, 614 F.3d 30, 42 (2d Cir. 2010)) (internal quotation marks omitted); *see* Fed. R. Evid. 611(a). For example, "a district court may impose reasonable limits on cross-examination to protect against, e.g., harassment, prejudice, confusion, and waste." *James*, 712 F.3d at 103 (citing *United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011)) (internal quotation marks omitted).

Here, allowing Mr. Hamlett to cross examine Jane Doe on sexual acts that predate the period covered by the indictment would have little, if any, probative value to the charges against Mr. Hamlett. Consistent with the Confrontation Clause, the Court may impose reasonable limits on cross-examination to prevent "harassment, prejudice, confusion, and waste." *United States v. Ulbricht*, 858 F.3d 71, 118 (2d Cir. 2017). Wading into Jane Doe's prior sexual history would only serve to prejudice and confuse the jury about the scope of the criminal charges and the relevant conduct. Indeed, the "very purpose" of Rule 412 of the Federal Rules of Evidence "is to preclude defendants from arguing that because the victim previously consented to have sex—for love or money – her claims of coercion should not be believed." *Rivera*, 799 F.3d at 185; *see id.* ("Prior sexual contact for money or pleasure was irrelevant to whether the victims' sexual activities at the bars were the result of coercion.").

While Mr. Hamlett has the constitutional prerogative to confront witnesses, "it does not follow, of course, that the Confrontation Clause prevents a trial judge from imposing limits on defense counsel's cross-examination of government witnesses." *Id.* (alterations and quotation marks omitted). At trial, the Court limited Mr. Hamlett's cross-examination to the period of the indictment—no more, no less.

Accordingly, Mr. Hamlett has not established the "extraordinary circumstances"

necessary for a new trial, *see Coté*, 544 F.3d at 101, the Court will therefore "defer to the jury's resolution of conflicting evidence and assessment of witness credibility," *see Ferguson*, 246 F.3d at 134.

### 3. Cross-Examination regarding Mental Health Diagnosis

Rule 403 allows a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "Under Rule 403, so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006).

"A district court's evidentiary determinations generally 'will not be disturbed unless they are manifestly erroneous.'" *United States v. Scully*, 877 F.3d 464, 473–74 (2d Cir. 2017) (quoting *Davis v. Velez*, 797 F.3d 192, 201 (2d Cir. 2015)). Even if there is an error, "a new trial is not required if the error was harmless." *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). An erroneous ruling on the admissibility of evidence is harmless if "the evidence did not substantially influence the jury." *United States v. Jackson,* 301 F.3d 59, 65 (2d Cir. 2002) (internal quotation marks omitted), *abrogated on other grounds by Chambers v. United States,* 555 U.S. 122 (2009)).

Mr. Hamlett argues that the Court should have allowed expert testimony regarding potential health disorders of Jane Doe and Mary Smith. Mem. of Law in Supp. of Mot. for New Trial at 44. Mr. Hamlett contends that the expert testimony was necessary to help the jury understand how particular mental health disorders could impact the credibility of Jane Doe and

Mary Smith. *Id.* at 47.

In response, the Government argues that the Court properly prohibited cross-examination of Jane Doe or Mary Smith about any alleged mental health diagnoses from DCF records because those diagnoses lacked proper evidentiary foundation and would have been unduly prejudicial. Mem. of Law in Opp'n to Mot. for New Trial at 29. Absent expert testimony, the Government argues that the evidence of mental health impressions of DCF personnel would have led to prejudicial jury speculation. *Id.* at 29–30. The Government also argues that Mr. Hamlett failed to link the purported diagnoses to the reliability of the victim's testimony. *Id.* at 30. Finally, the Government argues that Mr. Hamlett's proposed expert testimony would have invaded the province of the jury, by making credibility determinations of witnesses. *Id.* at 31–33.

The Court agrees.

Here, the Court found that the introduction of those DCF records would confuse the jury. October 10 Transcript, ECF No. 327, at 547:19–548:14. While the Court did not prohibit Mr. Hamlett from introducing evidence that a witness's memory might be faulty or that they are motivated by an ulterior motive, in order for the jury to infer that there is a correlation between any of Jane Doe or Mary Smith's mental health diagnoses and their credibility as a witness, a proper evidentiary foundation would have to be laid.

Within this limitation, the Court still granted Mr. Hamlett's counsel leeway to interrogate Mary Smith about whether her ex-boyfriend introduced her to sex trafficking and that she self-trafficked through backpage.com. *See* October 11, 2018 Trial Transcript, ECF No. 328, at 746:8–19 ("So you can correct me if I get sort of the order of it wrong. And when he was asking you these questions about what you had been doing, you told him that your boyfriend Tyquon Jiles had been pimping you out; isn't that correct? A. No. Q. You didn't tell Dwight Grant that? A. No,

I did not. Q. So Dwight Grant would be lying -- A. Yes, he would be. Q. -- if he put that in a DCF, report? A. Yes."); *id.* at 750:7–752:1 ("Q: But you didn't like him. And you didn't tell Mr. Grant that Tyquon Jiles was pimping you out? A: No, I did not. He made that up. Q: And Mr. Grant, did he make up that you told him that you posted yourself on Backpage as well, or did you tell him that you posted yourself on Backpage? A: I put – I don't know. Q: Well, in that conversation when you are talking about the sex for money and – A: I did not say I posted my own self on Backpage. Q: So he asked you about Backpage, though, didn't he? A: Yes. Q: Didn't he mention that he saw – and I'm not going to say the name, but someone else on Backpage who has nothing to do with this case? A: No. Q: He didn't mention to you a girl's name that begins with a "K" that he had seen on Backpage? A: No. Q: And you didn't have a conversation where you asked him about why he looked on Backpage and he said sometimes it's to try and find kids who are missing? That didn't happen? A: No. Q: And you didn't tell him that you have posted yourself on Backpage? A: No, I did not. Q: So if it's in a DCF form investigation report, it's a lie? A: Okay. Q: Right? A: Yes."); *id.* at 771:13–18 ("Q. But you just told me a little while ago that Mr. Grant is absolutely lying -- A. Yes. Q. -- if he said that you told him Tyquon Jiles was the person who pimped you out, right? A. Yes.").

But Mr. Hamlett failed to lay the proper foundation about the alleged diagnoses, and whether either Jane Doe or Mary Smith suffered from any such diagnosis at the time of the events in the indictment. The Court therefore found that introduction of the evidence—without more foundation and an expert proffer about the veracity of using DCF narratives as a basis for a mental health diagnosis—would needlessly confuse the jury.

In the absence of such an evidentiary foundation, the Court properly excluded any question suggesting that a jury should not believe a victim's testimony or is less credible simply

because of a particular mental health diagnosis. *See Holmes,* 547 U.S. at 326 ("well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"); *see also United States v. Sasso*, 59 F.3d 341, 347–48 (2d Cir. 1995) ("Evidence of a witness's psychological history may be admissible when it goes to her credibility . . . In assessing the probative value of such evidence, the court should consider such factors as the nature of the psychological problem, [ ] the temporal recency or remoteness of the history, [ ] and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her 'ability to perceive or to recall events or to testify accurately'" (citations omitted)).

Because "[o]ne's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice" and "[i]f of minimal probative value," an inquiry into the mental health history of the victim would be "manifestly unfair and unnecessarily demeaning of the witness." *Velasquez v. United States*, 801 A.2d 72, 79 (D.C. 2002) (upholding the trial court finding that the defendant failed to justify invasion in to witness's privacy regarding prior mental health history because there was no expert opinion offered to support the defense theory that the delusional episode was connected to the claims at issue) (citations omitted). Even then, "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely v. N.Y.C.*, 414 F.3d 381, 398 (2d Cir. 2005) (citations omitted).

Moreover, the Second Circuit has held that a district court is "in the best position to do the balancing mandated by Rule 403." *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998)

(per curiam). In this case, the Court made "a conscientious assessment of whether unfair prejudice substantially outweighs probative value" and concluded that the prejudice and confusion of introduction of subjective mental health diagnoses by untrained DCF staff would substantially outweigh any probative value on witness credibility—even with the proposed expert testimony. *See Salameh*, 152 F.3d at 110 ("Under Rule 403, relevant evidence may be excluded when its probative value is 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'. . . To avoid acting arbitrarily, the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." (citations omitted)). Nothing presented by Mr. Hamlett changes the Court's previous assessment.

Accordingly, Mr. Hamlett has not established the "extraordinary circumstances" necessary for a new trial, *see Coté*, 544 F.3d at 101, the Court therefore will "defer to the jury's resolution of conflicting evidence and assessment of witness credibility," *see Ferguson*, 246 F.3d at 134.

### 4. Testimony of Elaine Smith

Under Federal Rule of Evidence 608(a), "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." The Court, however, may exclude that same evidence when its prejudicial effect substantially outweighs its probative value under Rule 403. See Fed. R. Evid. 403.

Mr. Hamlett argues that the Court should have allowed Elaine Smith, Jane Doe's former foster mother, to testify regarding Jane Doe's capacity for truthfulness. Mem. of Law in Supp. of

Mot. for New Trial at 48. And that the Court did not have a basis for excluding this character testimony under Rule 608(a). *Id.* at 49.

In response, the Government argues that any witness testimony about the period before these criminal charges would be collateral to the issues the jury must decide. Mem. of Law in Opp'n to Mot. for New Trial at 34–35. And the Government testimony from Jane Doe's foster mother would be too remote and too prejudicial for the Court to admit the evidence because of its limited probative value. *Id.* at 35.

The Court agrees.

Here, allowing Elaine Smith to testify about Jane Doe's reputation for truthfulness would have created a collateral issue at trial; i.e. whether Jane Doe was truthful with her former foster mother, years before the events underlying the indictment. *See United States v. Williams*, No. 11-cr-63(AT), 2014 WL 4651968, at *6 (S.D.N.Y. Sept. 15, 2014) ("A matter has been held to be collateral if it could not have been introduced in evidence for any purpose independent of . . . impeachment." (quoting *United States v. Walker,* 930 F.2d 789, 791 (10th Cir. 1991)). That conduct, however, was not before this jury and adding an in-depth inquiry into that issue would have entailed speculation and distraction on an unrelated issue. Without Mr. Hamlett anchoring Elaine Smith's testimony to conduct relevant to the indictment, the Court identified that there was a "danger of unfair prejudice, confusion of the issues, or misleading the jury." *See* Fed. R. Evid. 403. And Mr. Hamlett's motion for a new trial has not changed this determination.

Accordingly, Mr. Hamlett has not established the "extraordinary circumstances" necessary for a new trial, *see Coté*, 544 F.3d at 101, the Court therefore will "defer to the jury's resolution of conflicting evidence and assessment of witness credibility," *see Ferguson*, 246 F.3d at 134.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** both the motion judgment of acquittal and the motion for a new trial.

**SO ORDERED** at Bridgeport, Connecticut, this 26th day of July 2019.

         /s/ Victor A. Bolden
       VICTOR A. BOLDEN
       UNITED STATES DISTRICT JUDGE